IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

JAIME LYNN HADDIX,

      Plaintiff,

v.

                                   Civil Action No. 1:14-cv-12
                                   (The Honorable Irene M. Keeley)

COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

## REPORT AND RECOMMENDATION/OPINION

Jaime Lynn Haddix ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant" and sometimes "Commissioner") denying her claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I. PROCEDURAL HISTORY

Plaintiff filed applications for SSI and DIB on December 14, 2010, alleging disability since June 1, 2009, due to "bipolar, social anxiety, general anxiety, psychosocial"(R. 164-74. 195). She subsequently amended her onset date to March 31, 2009 (R. 190). The state agency denied Plaintiff's applications initially and on reconsideration (R. 93-102, 108-21). Plaintiff requested a hearing, which Administrative Law Judge ("ALJ") Terrence Hugar held on August 12, 2012, and at which Plaintiff, represented by counsel, Michael Miskowiec; her husband, Eric Haddix; and Larry

Ostrowski, a vocational expert ("VE") testified (R. 41-88.)  On September 26, 2012, the ALJ entered a decision finding Plaintiff was not disabled (R. 11-23).  Plaintiff filed a request for review with the Appeals Council (R. 261).  On December 3, 2013, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-7.)

## II. STATEMENT OF FACTS

Plaintiff was born on March 7, 1978, and was thirty-four (34) years old on the date of the administrative hearing (R. 22, 43).  She completed the tenth grade (R. 46).  Plaintiff's past relevant work included cashier and telemarketer (R. 196).

On July 2, 2009, Plaintiff saw Leslie Metheny of the United Summit Center ("USC") for an initial evaluation.  Ms. Metheny noted that Plaintiff was "a readmission of a closed chart."  Plaintiff had been referred to USC by 2-south.  She had admitted herself to 2-south on June 23, 2009, and was discharged on June 30, 2009.  Plaintiff had admitted herself "because of depression, stress and suicidal ideations."  Plaintiff reported that "she does not like it out in the world" and that she was "afraid of things in the world."  She stated that she had been depressed most of her life and had lost her father when she was 14 years old.  Plaintiff reported being sexually and physically abused when she was a child.

Plaintiff told Ms. Metheny that "certain things" trigger her temper.  She did not get along with her sister-in-law.  Plaintiff's sister-in-law had been spreading lies about her, causing Plaintiff to lose custody of her son to his biological father.  Plaintiff reported that she had a pending "domestic violence order on herself" because of a fight she had with her sister-in-law.  She noted that at the time of the fight, she had not taken her medications that control her mood swings.  If Plaintiff got angry, she blacked out.  Plaintiff took lithium, Restoril, and Trazodone; she felt like the

2

medication was "too much at one time." Plaintiff's medications helped her sleep, but she did not feel relaxed during the day (R. 265). On the day she was arrested for domestic violence, Plaintiff tried to commit suicide by jumping out of the window of the car; her husband pulled her back in. She reported having no suicidal thoughts since being put back on her medications. Plaintiff and her husband had lost their home about five (5) months ago; they had been paying rent but the landlord was not making his payments (R. 266).

Ms. Metheny noted that Plaintiff was oriented "to person, place, time and situation." Plaintiff was cooperative and had appropriate grooming and hygiene (R. 266). Ms. Metheny diagnosed "bipolar disorder Nos–as evidence d by depression, extreme mood swings, social isolation, impulsivity, anger, hostility, violence, agitation, poor concentration, poor judgment, decreased appetite, decreased sleep, paranoia, suspiciousness, manic episodes" and "primary support group problems." Plaintiff was to attend six (6) anger management sessions and to receive a psychiatric evaluation, family counseling, and assessments and treatment planning (R. 268).

Plaintiff had a psychiatric evaluation with Nurse Practitioner ("NP") Linda McPherson on July 30, 2009. Plaintiff reported that she had stopped taking her medications for bipolar disorder about eight years ago when she met her husband. Her husband "talked her into going off her medication saying she didn't need it." Plaintiff did "quite well" for a "long time" but noted increased stress and anxiety during the last couple of years. Plaintiff's condition became worse, as she ended up with two domestic violence charges, one from a fight with her husband and the other from a fight with her sister-in-law. Plaintiff was doing "a lot better" since being discharged from 2-South and being put on Lithium, Restoril, Risperdal, and Xanax (R. 283).

NP McPherson noted that Plaintiff was oriented "to person, place, time and situation." She

was cooperative, had appropriate grooming and hygiene, and had good eye contact. NP McPherson diagnosed bipolar disorder and primary support group problems. She assigned a Global Assessment of Functioning ("GAF") score of 50. NP McPherson increased Plaintiff's Risperdal dose and continued her on Xanax and Lithium. She instructed Plaintiff to return in one month (R. 284).

On August 27, 2009, Plaintiff saw Dr. Paul Davis with complaints of feeling "sleepy all day." She also complained of numbness in her hands. Dr. Davis diagnosed bipolar disorder, paresthesias, and myositis. He instructed Plaintiff to stop taking Trazodone (R. 318).

Plaintiff returned to Dr. Davis for a follow-up appointment on October 8, 2009. She asked about resuming Trazodone because she was not sleeping well. Plaintiff reported feeling "good and calm" but that she still had "occasional 'down' days." Dr. Davis assessed insomnia and bipolar disorder. He resumed Plaintiff's Trazodone prescription and instructed her to continue taking lithium (R. 318).

Plaintiff had a review assessment at USC with Elizabeth Bates, BS CM PD, on December 8, 2009. Ms. Bates noted that Plaintiff had attended one (1) of two (2) pharmacological management sessions and three (3) of four (4) therapy sessions. She had not experienced suicidal thoughts or acted violently. Plaintiff had been court-ordered to continue individual therapy until August 2010. Ms. Bates noted that Plaintiff needed case management "due to deficits in adult daily living skills related to mental illness." Plaintiff presented with good hygiene and grooming; she was dressed "neatly and appropriately." Plaintiff was "in good spirits" and was oriented as to all four spheres. Her speech was "goal directed and logical," and she denied suicidal and homicidal ideation as well as psychosis (R. 285-92).

On May 7, 2010, Plaintiff saw Vickie Ashcraft at USC for an assessment. Plaintiff had been

admitted to the Crisis Stabilization Unit "due to the prospect of being homeless and away from her husband and children due to domestic violence charges she incurred in June 2009 against her sister-in-law." Plaintiff reported that because of these charges, she may not be able to reside with her family for three (3) years. She worried that her children would be taken away because of her mental illness and her husband's physical disability. Plaintiff stated that she could not work because of a "social phobia" (R. 302). Ms. Ashcraft noted that Plaintiff was oriented in all four spheres and that her grooming and hygiene were "neat, clean and appropriate." Plaintiff had fair concentration, a dysphoric mood, and a congruent affect. She reported having racing thoughts, but her thought processes "appeared logical and goal oriented." Plaintiff had poor insight into problems and judgment. She denied "obsessions, compulsions, hallucinations, delusions, homicidal, or suicidal ideations." Ms. Ashcraft diagnosed bipolar I NOS; pituitary tumor; and housing problems. She assigned a GAF score of 45. Plaintiff was to receive intensive individual and group therapy and pharmacological management (R. 303-04.) Plaintiff was discharged from the Crisis Stabilization Unit on May 9, 2010 (R. 312).

On June 4, 2010, Plaintiff had a one-year review at USC with Brian Hawk, BS/PDCC. She reported that her medication was keeping her stable, but she still did not like going out in public. Plaintiff had been prescribed Xanax for anxiety. Her husband reported that Plaintiff woke up in the middle of the night "scared and shaking" and that she liked to "stay to herself and not be around neighbors." Plaintiff had a habit of going through the house and turning everything off because of anxiety. She was afraid of the police coming "constantly." Plaintiff had a manic episode the week before; she was "awake for a good while and paced the hallways." Xanax helped her anxiety and her other medications were "efficient." Plaintiff was worried about a HUD hearing and her

disability. Her depression was day to day, and she got agitated easily. Plaintiff had no suicidal ideation, but she experienced "hostile thoughts and anger." Mr. Hawk noted that Plaintiff was oriented in all four spheres and was appropriately dressed and groomed. Plaintiff was cooperative. She had an anxious mood and congruent affect (R. 274-82).

Plaintiff had a one-year review at USC with Mr. Hawk on January 11, 2011. She reported that she was still experiencing anxiety and depression. The holidays were "especially rough for her." Plaintiff had mood swings "a good bit" and did not go out anywhere. It was hard for her to go to children's functions because of crowds and people. Mr. Hawk noted that Plaintiff was oriented on all four spheres and cooperative. She exhibited appropriate dress and grooming. Plaintiff had an anxious mood and affect. She denied hallucinations, delusions, and homicidal or suicidal ideation (R. 269-71).

Plaintiff completed a Function Report–Adult on March 9, 2011. She reported that on some days, she could not get out of bed. Plaintiff got "really nervous" around people other than her family members. Plaintiff was unable to drive or go shopping. She lost concentration very easily and fell asleep because of her medication (R. 218). Plaintiff cared for her family if she was able to get up. Her husband and mother-in-law cooked and cleaned for her when she was unable to. When Plaintiff was depressed, she would not dress, bathe, care for her hair, shave, or feed herself (R. 219). Sometimes her husband needed to tell her to eat, and she used an alarm to remind her to take her medication. Plaintiff could prepare her own meals, but did not cook on some days. She could not do household chores on some days. Her husband would talk to her to encourage her to do chores (R. 220). Plaintiff did not go outside very often because she was a "nervous person." Her husband drove her around because she was too nervous to drive. Plaintiff could count change but could not pay bills, handle a savings account, or use a checkbook/money orders because she got sidetracked

6

and could not remember what she did "with things" (R. 221). Plaintiff's hobbies and interests included watching television, playing with her children, and taking care of her husband and children. She did not spend time with others (R. 222). Plaintiff got nervous around people and got "very agitated" at others when her medication was "not working." She was unable to do social activities and had lost all of her friends[1] (R. 223).

On April 1, 2011, Plaintiff presented to the emergency department at United Hospital Center ("UHC") with complaints that her hands and arms had been shaking uncontrollably and constantly for three days. She stated that she had experienced similar symptoms in the past and that they were usually related to "lithium and other medication reactions." She thought the instant event "may be related to Xanax but [was] unable to give any further info." Plaintiff denied missing any dosages or changing any dosages (R. 372). Plaintiff was given Benadryl, which caused her shaking to stop (R. 373). Staff diagnosed tremors and noted a dystonic reaction (R. 378-79). She was prescribed one Benadryl capsule and was discharged with instructions to follow up with her primary care physician (R. 382-83).

Plaintiff saw Dr. Davis again on April 19, 2011 for a follow-up for her bipolar disorder. She stated that she was "doing well" on her current medications for bipolar disorder. Dr. Davis diagnosed bipolar disorder unspecified; agoraphobia with panic disorder; hyposmolality and/or hyponatremia; and pelvic pain–female. He prescribed Zanaflex (R. 384).

---

[1] In an undated Function Report–Adult, Plaintiff provided more information. She stated that she shook "a lot," that she experienced a lot of headaches, and that she had muscle pain (R. 236). On a typical day, Plaintiff would get up and help her eight-year-old son get on the school bus. She would then go back to bed and get up between 10:00 and 11:00 a.m. (R. 237). Plaintiff reported that usually she prepared sandwiches, hot dogs, chicken, and "quick and easy to fix meals" (R. 238).

On May 26, 2011, Plaintiff saw Beverly Langland for an evaluation at USC. Plaintiff presented with "moderate symptoms of depression, panic, anxiety, manic, agitation, distractability, loss of interest on activities, change in appetite, withdrawal, impulsivity, compulsions, poor concentration, and obsessive thoughts." Ms. Langland noted that Plaintiff had "bipolar NOS" and high blood pressure (R. 391). At the assessment, Plaintiff was "oriented times four" with normal grooming and hygiene. She was cooperative and made good eye contact. Ms. Langland asssessed bipolar disorder NOS and assigned a GAF score of 51-60 (R. 392).

On June 6, 2011, a staff member at USC, whose name is illegible, completed a Routine Abstract Form–Mental for Plaintiff. This form noted that Plaintiff was last seen at USC on April 13, 2011[2] (R. 387). The staff member completing the form noted that Plaintiff was fully oriented, but had rambling speech, paranoid delusions, mildly deficient judgment and insight, and an anxious mood. Plaintiff also appeared "fidgety" (R. 388). Plaintiff was moderately deficient in her social functioning and her pace (R. 389). She was diagnosed with bipolar disorder and was assigned a GAF of 55 (R. 390).

Ms. Lilly completed a Psychiatric Review Technique of Plaintiff on July 23, 2011 (R. 414). She determined that Plaintiff had "[b]ipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes)" (R. 417). Plaintiff also had "[p]anic disorder by PCP and not by psychiatrist" (R. 419). Ms. Lilly found that Plaintiff had mild restrictions in her activities of daily living; moderate difficulties in maintaining concentration, persistence, and pace; and marked difficulties in maintaining social functioning. Plaintiff had not had any episodes of decompensation

---

[2] Records from this visit are not included in the administrative record.

(R. 424).

On July 23, 2011, Ms. Lilly completed a Mental Residual Functional Capacity of Plaintiff. She determined that Plaintiff was moderately limited in her ability to understand and remember detailed instructions; to carry out detailed instructions; maintain attention and concentration for extended periods; and perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances (R. 428). Plaintiff was also moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Ms. Lilly also opined that Plaintiff was moderately limited in her ability to interact appropriately with the general public and to respond appropriately to changes in the work setting (R. 429). Ms. Lilly determined that Plaintiff was not "totally credible" and that she retained "the ability to learn, recall, and perform simple, unskilled work-like activities in settings that do not require frequent changes or interacting on a regular basis with the general public" (R. 430).

Plaintiff had an Initial/Review Assessment with Ashley Coontz at USC on April 24, 2012. Plaintiff's husband accompanied her. She sought treatment for bipolar disorder, depression, and anxiety. Plaintiff reported "a loss of sleep, worrying about anything and everything, trouble concentrating, change in energy levels, agitation, isolation, manic episodes, and unable to deal with change." She stated that when she comes out of a manic phase, her husband has to remind her to take a shower or clean up the house (R. 488). She also experienced extreme tiredness and falls asleep when people are talking to her. Plaintiff moved her leg throughout the assessment "to where it shook the floor she did it so hard and fast." Plaintiff had "extreme difficulty" going out into public because of anxiety. Ms. Coontz noted that Plaintiff had "problems keeping her appointment because

she was so nervous about meeting someone new and having to talk to them face to face." Plaintiff's husband would make her leave the house at times. He used to take her Wal-Mart, but they would have to leave because of all the people. He only took her there on certain days "either really early or really late in the evening." Plaintiff reported that when she got nervous, her heart beats "really fast." She also reported that during her childhood, her stepmother physically abused her and her stepbrothers sexually abused her. Plaintiff stated that she had been arrested for domestic violence twice (R. 489). She did not like her sister-in-law and "could not deal with her." Plaintiff "beat up" her sister-in-law twice; she had to spend a night in jail for one of those times. Plaintiff has made suicide threats, including "jumping off a bridge, jumping out of a 2 story window, and has attempted to jump out of a moving car twice." Plaintiff lived off of her husband's disability (R. 490).

Ms. Coontz noted that Plaintiff was "oriented X4: person, place, time, and situation." Plaintiff was appropriately dressed and appeared clean and well kept. She was "obviously nervous and anxious. She shook her leg throughout the entire assessment." Plaintiff was "cooperative and informative" (R. 490). Ms. Coontz assessed bipolar I disorder, most recent episode manic Severe without psychotic features; generalized anxiety disorder; posttraumatic stress disorder; and "2 domestic charges and not able to work." She assigned a GAF score of 31-40. Plaintiff was to receive "low end treatment including: individual therapy, care coordination, re-assessments every 180 days or at critical juncture, medication management, and will utilize crisis services if needed" (R. 491).

On May 20, 2012, therapist Sandra Jones at USC wrote a "To Whom It May Concern" letter. Ms. Jones noted that Plaintiff had been a client at USC since June 2009, and that she had seen Plaintiff for therapy since July 10, 2009. Ms. Jones opined that Plaintiff suffered from depression,

anxiety, and mood instability. She noted that Plaintiff was unable to "be around people because she gets nervous and is easily agitated." Specifically, Plaintiff's "infrequent attempts to grocery shopping" often ended with her making "verbally aggressive statements to others." Ms. Jones stated that Plaintiff was impulsive "at times," worried "excessively," and had poor concentration. Plaintiff was able to care for her children and husband. She missed appointments at times because she would not leave her home. Ms. Jones opined that Plaintiff's "symptoms consistently impair her to the degree that she is not able to function in a work setting where she would need to interact with people or be able to concentrate"[3] (R. 487).

Plaintiff saw Ms. Jones for an Initial/Review Assessment at USC on July 5, 2012. Ms. Jones noted that Plaintiff had "depression, anxiety, agitation, poor sleep and concentration." Plaintiff had not been able to work since 2009 because of "symptoms of social phobia." She also had PTSD from childhood physical and sexual abuse. Plaintiff also indicated some "growing frustration with the lack of privacy and time to spend with her husband" (R. 505-06). Ms. Jones noted that Plaintiff's husband was "very supportive" and accompanied her to all of her appointments. Plaintiff had "difficulty being around people" and was "easily agitated" (R. 506).

Upon examination, Ms. Jones noted that Plaintiff was "oriented to all spheres." She was appropriately dressed and groomed. Plaintiff was able to maintain "adequate eye contact," but at times talked "very little" and relied on her husband to "share her thoughts and concerns" (R. 506-07).

_____

[3]Ms. Jones wrote a letter substantially similar to this one on June 14, 2012. In the June 14, 2012 letter, she further opined that Plaintiff was unable to "participate in public activities." In sum, Ms. Jones stated that it was her "professional opinion that [Plaintiff's] prognosis is poor related to future employment and the length of this incapacity is indefinite" (R. 493). In an undated note on the June 14, 2012 letter, Dr. Davis agreed with Ms. Jones' assessment "as it has been confirmed in [his] medical practice." He noted he had treated Plaintiff since 2006 (R. 537).

Plaintiff denied experiencing hallucinations or delusions, and Ms. Jones did not observe those. Plaintiff also denied having current suicidal or homicidal ideation, intent, or plan. Ms. Jones diagnosed bipolar I disorder, most recent episode manic Severe without psychotic features; generalized anxiety disorder; posttraumatic stress disorder; and "2 domestic charges not able to work." She assessed a GAF of 31-40. Plaintiff was to receive individual therapy with Ms. Jones every two weeks and pharmacological management as scheduled (R. 507).

Administrative Hearing

At the hearing, Plaintiff testified that she lived with her husband and two children (R. 46). Her source of income was her husband's disability payments. Plaintiff's husband was disabled because of his back and mobility problems. Plaintiff also received food stamps. She received help from her mother-in-law, and her sister-in-law helped with her two children (R. 47).

Plaintiff last worked at 7-11 as a cashier. She quit working there in January 2009 because her bipolar disorder was "starting to act up" (R. 48-49.) Plaintiff was discharged from 7-11 for getting into arguments and fights with her supervisor, co-workers and customers (R. 53). Plaintiff also worked at CDG Management, LLC, as a telemarketer. That job involved trying to sell "things" to people" and giving them "free trips to Bahamas if they would buy this certain project." Plaintiff testified that she started becoming violent with her co-workers and supervisors because her bipolar "started acting up really bad" (R. 49). She would flip tables over on top of people and use improper language. When she was discharged from CDG Management, she slammed the doors and "glass started rattling" (R. 50).

Plaintiff testified that she and her husband were evicted from their trailer because their landlord was not making matching rent payments to the mortgage company. They went to live with

her husband's sister. Plaintiff lived there "off and on" because her husband's sister would throw her out because they did not get along (R. 54). Her husband's sister threw her out because of her "violent behavior," attitude, and "overly stressed level." Her husband and children were thrown out by her husband's sister on Easter weekend of 2009 (R. 55).

Plaintiff was supposed to go to counseling at USC once a week; however, she only attended twice a month, "if that." Plaintiff missed appointments because her anxiety and fear caused her to be unable to leave her house. When Plaintiff attended counseling, she would sit in her car and wait for a therapist to call and tell her that she was ready. Plaintiff would then enter the building and the therapist would meet her at the elevator so she didn't "have to be in the same room with all kinds of people." Being around "all kinds of people" bothered Plaintiff (R. 56).

The medications Plaintiff took for her conditions caused her to become sleepy about fifteen (15) to twenty (20) minutes after taking them. She would stay sleepy "for hours;" she would actually fall asleep at times. Plaintiff testified that on the day of the hearing, she felt "tired and wore out," like a "truck ran over" her. She usually felt that way from her medications (R. 58). Plaintiff averaged four (4) hours of sleep per night. She would fall asleep right away if she could get her mind "to slow down"; if not, she would stay awake. Plaintiff experienced periods where she would not sleep at all; the last time that happened was three (3) weeks ago (R. 59). One time, Plaintiff couldn't sleep for about four (4) days; at the end of that time, she "crash[ed]."

Plaintiff's husband had to remind her to eat every day. She had no appetite (R. 60). On a couple days per week, Plaintiff would not get out of bed. On those days, she would or would not get dressed. Plaintiff did not get dressed about one (1) day per week. Plaintiff's husband had to encourage her to bathe. At one time, Plaintiff did not bathe for two (2) weeks (R. 61). When

Plaintiff's husband reminded her to do things, she would get embarrassed and agitated. Plaintiff thought of hurting herself since she stopped working. She tried to jump out of a vehicle in 2009, and her husband made her go to a crisis center (R. 62). At one time when Plaintiff was homeless and sleeping under a bridge, she tried to jump off a bridge (R. 63). She did not jump because her husband drove by, saw her, and grabbed her (R. 64).

Plaintiff did not read for entertainment. She did not watch movies with her children because her attention span was "not very good." Plaintiff got migraines about three (3) times per week (R. 64). She was prescribed Imitrex for the headaches. Before Imitrex, her headaches would last for a day or two; with Imitrex, they lasted approximately four (4) hours. In 2012, Plaintiff tried to again jump out of a vehicle, but her husband pulled her back in while he was driving (R. 65-66). She testified that her husband was her "shoulder to lean on" and that he was the only one she felt safe around. Plaintiff and her husband had been together for twelve (12) years and spent every day together (R. 66). Plaintiff's husband did the grocery shopping. Plaintiff would sometimes go with him, but there were times when she could not "handle the situation." She would have to sit in the car or her husband would have to take her home and then go out shopping (R. 67).

Plaintiff's husband, Eric Haddix, also testified. Mr. Haddix received disability for back troubles, lymphedema, fibromyalgia, and chronic arthritis (R. 75). He noted that his sister would "repeatedly" throw Plaintiff out of her home because Plaintiff would not take care of herself. Plaintiff would not bathe or shave, and she would be "short-tempered" (R. 68). Plaintiff also would not get out of bed to do anything. Mr. Haddix testified that since Plaintiff lost her job at 7-11, there had been times when she left home and he did not know where she was. However, after he was able to get her to go to the hospital and see a therapist, she had not "run off" again (R. 69). He had

Plaintiff start going to USC because he was afraid she would commit suicide when she tried to jump out of the car. Plaintiff also would become violent with him. Mr. Haddix stated that Plaintiff no longer got violent with him, but that she still got angry "very easily." At times, she hid under the covers or in the closets. When Plaintiff's attorney visited their apartment to prepare for the hearing, Mr. Haddix met him at the door because Plaintiff was hiding behind the kitchen door (R. 71).

Mr. Haddix testified that Plaintiff did not do well socializing with others. She got easily aggravated at the grocery store when, for example, someone bumped into the cart or the children. If he did not stop her, she would confront others (R. 72). Plaintiff and her husband used an alarm to remind them to take their medications. Mr. Haddix had to remind Plaintiff to shower, shave, change her clothes, and clean up. Plaintiff did not have control of credit cards because if she had a manic state, she would "spend money without thinking about it" (R. 73). Plaintiff's lawyer noted that Plaintiff appeared to have fallen asleep by the end of Mr. Haddix's testimony (R. 76).

The ALJ asked the VE the following hypothetical question:

Dr. Ostrowski, I'd like you to assume a hypothetical individual the Claimant's age, education, and with the past jobs that you just described. Further assume that the individual is limited to simple, routine, and repetitive tasks; not able to perform at a production rate pace, but can perform goal-oriented work; must entail no more than occasional interaction with supervisors, co-workers, and the public, with only occasional changes in the workplace.

Can the hypothetical individual perform any of the past jobs that you described as actually performed or generally performed in the national economy?

(R. 77-78). The VE responded that such an individual could not perform Plaintiff's past work, but could perform the jobs of kitchen helper, with 381,000 jobs nationally and 300 jobs regionally; industrial cleaner, with 1,200,000 jobs nationally and 1,400 jobs regionally; marker, with 250,000 jobs nationally and 250 jobs regionally; and mail clerk, with 70,800 jobs nationally and 60 jobs

regionally (R. 79).

The ALJ then asked the VE:

Thank you. The second hypothetical, Dr. Ostrowski, I'd like to ask you to consider the first hypothetical with one modification, and that is instead of only occasional interaction with the public, individual would be limited to no interaction with the public. Can the hypothetical individual perform any work? Please give me numbers and examples, please.

I'd like you to start with listing for the occupations you previously listed and whether or not those would be applicable with this additional limitation?

The VE responded that such an individual could still perform the jobs of kitchen helper, industrial cleaner, marker, and mail clerk (R. 79-80).

Evidence Submitted to the Appeals Council

Plaintiff had a checkup with Dr. Davis on July 3, 2012. She reported that she was doing well on her medications but was still having trouble sleeping. Dr. Davis noted that Plaintiff's pain was controlled and that she had a good mood with appropriate affect. He assessed bipolar disorder; brain tumor/OBS; neuropathy; and seizure disorder (R. 525).

Plaintiff saw Dr. Davis on August 23, 2012, for anxiety, low back pain, fatigue, and hypertension. She stated that her legs were "weak" and that she fell frequently. Plaintiff reported that "pain and muscle relaxants pills have helped her pain but not her weakness." Dr. Davis also did a check of Plaintiff's Lyrica and magnesium prescriptions. He noted that Plaintiff had a headache (R. 523). Dr. Davis diagnosed bipolar disorder unspecified and myositis. He prescribed Olanzapine and Xanax. He also instructed Plaintiff to taper her Geodon (R. 524).

### III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, ALJ Hugar made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2009.

2. The claimant has not engaged in substantial gainful activity since March 31, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: bipolar I disorder; generalized anxiety disorder; and posttraumatic stress disorder (PTSD) (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926) (R. 32).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: work must involve only simple routine and repetitive tasks; cannot perform at a production rate pace but can perform goal oriented work; work must entail no more than occasional interaction with supervisors and co-workers, and no interaction with the public; with only occasional changes in the workplace.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on March 7, 1978 and was 31 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from March 31, 2009, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

Plaintiff contends:

1. The ALJ's finding that Plaintiff and her husband were not credible "is based on an inaccurate and selective consideration of the evidence and is not supported by substantial evidence."

2.      The ALJ "gave no weight to the reports of [Plaintiff's] treating mental health providers at United Summit Center based on his invalid finding that her testimony of symptoms was not credible"; accordingly, the ALJ's "finding concerning [Plaintiff's] mental residual functional capacity is also not supported by substantial evidence."

3.      The ALJ failed to "include excessive sleepiness due to [Plaintiff's] psychotropic medications" in his RFC determination.

(Plaintiff's Brief at 1.)

The Commissioner contends:

1.      The ALJ reasonably found that Plaintiff's impairments did not meet the "B" criteria of Listings 12.04 or 12.06

.

2.      Plaintiff is not fully credible.

3.      The ALJ complied with the regulations when considering the medical evidence.

(Defendant's Brief at 7-13.)

### C.      Credibility and Side Effects

As her first ground for relief, Plaintiff asserts that the ALJ's finding that her testimony and the testimony given by her husband was not credible "is based on an inaccurate and selective consideration of the evidence and is not supported by substantial evidence." (Docket No. 13 at 1, 11.) According to Plaintiff, this conclusion "infected each of his subsequent findings including whether [her] mental impairment met the Commissioner's Listing of Impairments and the weight to be accorded the opinions of [her] treating mental health professionals at United Summit Center." (Id. at 11.) In relation to this claim, Plaintiff also alleges that the ALJ "completely ignored the side effects of her medications." (Id. at 14.) Specifically, she argues that despite multiple mentions in the record, the ALJ "did not include drowsiness or sleepiness as a side effect of the medications she was taking among her limitations." (Id. at 15.)

The ALJ has a "'duty of explanation'" when making determinations about credibility of the claimant's testimony." See Smith v. Heckler, 782 F.2d 1176, 1181 (4th Cir. 1986) (citing DeLoatche v. Heckler, 715 F.2d 148, 150-51 (4th Cir. 1983)); see also Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985). The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976)). This Court has noted that "[a]n ALJ's credibility determinations are 'virtually unreviewable.'" Ryan v. Astrue, No. 5:09CV55, 2011 WL 541125, at *3 (N.D. W. Va. Feb. 8, 2011) (Stamp, J.). If the ALJ meets his basic duty of explanation, "[w]e will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Sencindiver v. Astrue, No. 3:08-CV-178, 2010 WL 446174, at *33 (N.D. W. Va. Feb. 3, 2010 (Seibert, Mag. J.) (quoting Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000)).

In Craig v. Chater, 76 F.3d 585 (4th Cir. 1996), the Fourth Circuit developed a two-step process for determining whether a person is disabled by pain or other symptoms. That process is as follows:

> First, there must be objective medical evidence showing "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and *which could reasonably be expected to produce the pain or other symptoms alleged.*" . . . Therefore, for pain to be found disabling, there *must* be show a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers.* The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce" the actual pain, in the amount and degree, alleged by the claimant.
>
> . . .
>
> It is only *after* a claimant has met her threshold obligation of showing by objective

medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated. . . . Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings . . .; any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.) . . .; and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it . . . .

Id. at 594-95 (internal citations omitted). An ALJ "will not reject [a claimant's] statements about the intensity and persistence of . . . pain or other symptoms or about the effect [those] symptoms have on your ability to work . . . solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 416.929(c)(2) (alterations in original). Social Security Ruling ("SSR") 96-7p sets out some of the factors used to assess the credibility of an individual's subjective allegations of pain, including:

1.    The individual's daily activities;

2.    The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3.    Factors that precipitate and aggravate the symptoms;

4.    The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5.    Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6.    Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7.    Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). The determination or decision "must contain

specific enough reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight." Id. at *2.

As to Plaintiff's credibility, the ALJ stated:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(R. at 16.) Neither Plaintiff nor Defendant dispute the ALJ's determination as to the first step of the Craig analysis. Because the objective medical evidence indicates that Plaintiff does suffer from these conditions, the ALJ properly assessed the credibility of Plaintiff's testimony about her symptoms. See Craig, 76 F.3d at 585.

A review of the record reveals that the ALJ complied with both Craig and SSR 96-7p. First, the ALJ discussed Plaintiff's daily activities as follows:

> The claimant testified that she stayed home to take care of her children after she was fired from a telemarketing job. She also testified that she lives in her home with her husband and two children who are now six years old and nine years old. She stated that in addition to caring for the children themselves, they also receive weekly [sic] from two relatives. Both the claimant and her husband testified that the claimant is heavily dependent on her husband for activities of daily living. They both also testified that they depend on the husband's disability pay for their support. Mr. Haddix testified that he is disabled due to bad back problems and fibromyalgia. The undersigned has a difficult time understanding how Mr. Haddix, who is disabled due [sic] his back and fibromyalgia would be able to deliver such a complete and comprehensive level of care to the claimant as she and her husband report. These allegations distract greatly from the credibility of both the claimant and her husband. It is noted also that the claimant has very few years in the work force, even before her alleged onset date and during the period that she reported she was doing well without being on medications[.] (Exhibit 1F)

(R. at 17.) The ALJ also considered the location, duration, frequency, and intensity of Plaintiff's

symptoms, and her functional limitations and restrictions:

> The claimant is not entirely credible as to the nature and extent of her symptoms and limitations. The evidence of record does not reflect that she is as impaired as she alleges. Her objective mental status reports consistently identify her as cooperative, providing good history information, good eye contact. Her treating source who is [sic] primary care physician, notes that the claimant has normal mental status across time[.]
>
> . . .
>
> Records also show that after her arrest for domestic violence, the claimant was able to successfully complete an anger management program during the time frame in which she alleges that she was disabled. It is also noted throughout the record that the claimant, during mental status examinations is shown to have an appropriate mental status. (Exhibits 1F, and 15F)

(R. at 16-17.)

As noted above, Plaintiff asserts that the ALJ failed to consider that her medications cause her to experience extreme drowsiness. The ALJ did mention Plaintiff's testimony that "the medication side effects included sleepiness. (R. at 16.) However, Plaintiff primarily supports her argument by citing to statements made in her disability reports and during her testimony before the ALJ. For example, in her report dated March 9, 2011, Plaintiff stated that she fell asleep "a lot" because of her medication. (R. at 218.) In an undated report, Plaintiff reported that her medications made her drowsy, very tired, and sleepy. (R. at 243.) At the hearing, Plaintiff testified that she takes her medications at 9:00 a.m. and that they make her sleepy in about fifteen (15) to twenty (20) minutes. She remained "sleepy" for "five, six hours." Plaintiff fell asleep "every other day." During the hearing, she testified that she felt "tired and wore out" and like a "truck ran over" her. She usually felt that way from her medication. (R. at 58.)

The undersigned agrees with Plaintiff that on August 27, 2009, she told Dr. Davis that she had been feeling "sleepy all day." (R. at 318.) Dr. Davis instructed her to stop taking Trazodone.

23

(Id.)  However, this is the only piece of medical evidence that documents Plaintiff's sleepiness.  In fact, when Plaintiff returned to Dr. Davis on October 8, 2009, she asked about resuming Trazodone because she was not sleeping well.  (Id.)  On June 4, 2010, Plaintiff told Mr. Hawk at USC that Xanax helped her anxiety and that her other medications were "efficient."  (R. at 281.)  Likewise, on April 24, 2012, Plaintiff told Ms. Coontz at USC that she was experiencing "a loss of sleep."  (R. at 488.)  On July 5, 2012, Ms. Jones of USC noted that Plaintiff had "poor sleep."  (R. at 505-06.)  Again, when Plaintiff saw Dr. Davis on July 3, 2012, she told him that she was "doing well" on her present medications but that she was "still having trouble sleeping."  (R. at 525.)

"Drowsiness often accompanies the taking of medication, and it should not be viewed as disabling unless the record references serious functional limitations."  Burns v. Barnhart, 312 F.3d 113, 131 (3d Cir. 2002); see also Johnson v. Barnhart, 434 F.3d 650, 658 (4th Cir. 2005) (citing Burns); Swindle v. Sullivan, 914 F.2d 222, 226 (11th Cir. 1990); Turner v. Comm'r, 182 F. App'x 946, 949 (11th Cir. 2006).  This Court has previously expressed agreement with Burns.  See, e.g., Whitt v. Comm'r, No. 1:12CV52, 2013 WL 4784991, at *48 (N.D. W. Va. Sept. 6, 2013); Cogar v. Comm'r, 2:08CV124, 2010 WL 300373, at *23 (N.D. W. Va. Jan. 20, 2010).  Here, the record does not establish that Plaintiff's alleged extreme sleepinessresulted in "serious functional limitations."  Burns, 312 F.3d at 131.  Rather, the record reflects that Plaintiff often complained of getting very little sleep or sleeping poorly.  Accordingly, the ALJ did not err in not considering the side effects of Plaintiff's medications.

The ALJ then provided a thorough discussion of the medical evidence that is inconsistent with Plaintiff's subjective complaints.  Specifically, the ALJ discussed Plaintiff's treatment records from USC.  On July 2, 2009, Plaintiff had an initial evaluation at USC.  At that time, Plaintiff told

Ms. Metheny, the evaluator, that she had been in a fight with her sister-in-law and that at the time of the fight, she had not taken her medications that control her mood. (R. at 265.) Ms. Metheny noted that Plaintiff was oriented as to "person, place, time and situation" and was cooperative. (R. at 266.) She assigned Plaintiff a GAF of 55 and assessed bipolar disorder. (R. at 268.)

Plaintiff returned to USC on July 30, 2009 for a psychiatric evaluation with NP McPherson. She stated that she was doing "a lot better" since being prescribed lithium, Restoril, Risperdal, and Xanax. (R. at 283.) NP McPherson found that Plaintiff was oriented and cooperative and had good eye contact. She assigned a GAF score of 50. NP McPherson increased Plaintiff's Risperdal dosage and continued her on lithium and Xanax. (R. at 284.)

On December 8, 2009, Plaintiff had a review assessment with Ms. Bates of USC. Plaintiff denied acting violently and having any suicidal thoughts. She was dressed "neatly and appropriately." Ms. Bates noted that Plaintiff was "in good spirits" and was oriented as to all four spheres. Plaintiff's speech was "goal directed and logical," and she denied psychosis. (R. at 285-92.)

Plaintiff was admitted to the Crisis Stabilization Unit at USC on May 7, 2010 "due to the prospect of being homeless and away form her husband and children due to domestic violence charges she incurred in June 2009 against her sister-in-law." (R. at 302.) At that time, Plaintiff saw Vickie Ashcraft for an assessment. Ms. Ashcraft noted that Plaintiff was oriented in all four spheres, that she had a dysphoric mood and congruent affect, and appropriate grooming. Plaintiff had racing thoughts, but Ms. Ashcraft noted that Plaintiff's thought processes "appeared logical and goal oriented." Plaintiff denied "obsessions, compulsions, hallucinations, delusions, homicidal, or suicidal ideations." (R. at 303-04.) Plaintiff was discharged from the Crisis Stabilization Unit on

May 9, 2010.  (R. at 312.)

Plaintiff returned to USC for a one-year review with Brian Hawk on June 4, 2010.  She reported that she had been prescribed Xanax for anxiety and that her medications were keeping her stable.  Mr. Hawk noted that Plaintiff was oriented in all spheres and was cooperative.  She had an anxious mood and congruent affect.  (R. at 274-82.)  Plaintiff had another review with Mr. Hawk on January 11, 2011.  At that review, Mr. Hawk noted that Plaintiff was oriented in all four spheres and was cooperative.  She had an anxious mood and affect, but denied hallucinations and delusions.  (R. at 269-71.)

On June 6, 2011, a staff member at USC completed a Routine Abstract Form–Mental for Plaintiff.  That staff member noted that Plaintiff was fully oriented but had rambling speech and paranoid delusions.  Her judgment and insight were mildly deficient and she had an anxious mood.  Plaintiff appeared "fidgety." (R. at 388.) Her social functioning and pace were moderately deficient.  (R. at 389).  The staff member diagnosed bipolar disorder and assigned a GAF score of 55.  (R. at 390.)

On April 24, 2012, Plaintiff had an assessment with Ashley Coontz at USC.  Ms. Coontz noted that Plaintiff was oriented as to all spheres and was "cooperative and informative."  (R. at 490.)  However, Plaintiff was "obviously nervous and anxious.  She shook her leg throughout the entire assessment." (Id.) Ms. Coontz diagnosed bipolar I disorder, most recent episode manic severe without psychotic features; generalized anxiety disorder; and posttraumatic stress disorder.  (R. at 491.)  Plaintiff was to receive "low end treatment including: individual therapy, care coordination, re-assessments every 180 days or at critical juncture, medication management, and will utilize crisis services if needed."  (Id.)

Plaintiff had another assessment with Sandra Jones at USC on July 5, 2012. Ms. Jones noted that Plaintiff was oriented as to all spheres and was able to maintain "adequate eye contact." (R. at 506-07.) Plaintiff denied experiencing hallucinations and delusions, and Ms. Jones did not observe these. Ms. Jones diagnosed bipolar I disorder; generalized anxiety disorder; and posttraumatic stress disorder. (R. at 507.) Plaintiff was to receive individual therapy every two weeks and pharmacological management as scheduled. (Id.)

In sum, the undersigned finds that the ALJ complied with <u>Craig</u> and SSR 96-7p when assessing Plaintiff's credibility. The ALJ discussed Plaintiff's daily activities and the nature and extent of her symptoms and limitations. Although Plaintiff claims that the ALJ erred by not considering extreme sleepiness as a side effect of her medications, the record does not establish that Plaintiff's alleged extreme sleepiness resulted in "serious functional limitations." <u>Burns</u>, 312 F.3d at 131. The ALJ also thoroughly discussed the medical evidence contradicting Plaintiff's subjective complaints. Accordingly, the undersigned finds that substantial evidence supports the ALJ's credibility determination, and Plaintiff's claim is without merit.

### D.    Listings 12.04 and 12.06

Plaintiff also argues that the ALJ's conclusion regarding her credibility "infected each of his subsequent findings, including whether [her] mental impairment met the Commissioner's Listing of Impairments." (Plaintiff's Brief at 11.) According to Plaintiff, the testimony given by her and her husband, "as supported by United Summit Center treatment records, show a marked limitation in activities of daily living and concentration, persistence or pace." (Id. at 10.) Plaintiff appears to assert that if the ALJ had found her credible, her testimony would have provided substantial evidence for a finding that she met the "paragraph B" criteria of Listings 12.04 and 12.06. Defendant asserts

that the ALJ reasonably found that Plaintiff's impairments did not meet Listings 12.04 and 12.06. (Defendant's Brief at 7-10.)

Furthermore, a claimant bears the burden of demonstrating that his impairment meets or medically equals a listed impairment. Kellough v. Heckler, 785 F.2d 1147, 1152 (4th Cir. 1986). As the Supreme Court has stated,

> The Secretary explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard. The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just "substantial gainful activity." . . . The reason for this difference between the listings' level of severity and the statutory standard is that, for adults, the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary. That is, if an adult is not actually working and his impairment matches or is equivalent to a listed impairment, he is presumed unable to work and is awarded benefits without a determination whether he actually can perform his own prior work or other work.

Sullivan v. Zebley, 493 U.S. 521, 532 (1990) (internal citations omitted).

For Listings 12.04 and 12.06, the "paragraph B" criteria require that the medically documented impairment determined in "paragraph A" must "result[] in at least two of the following": (1) "marked restriction of activities of daily living"; (2) "marked difficulties in maintaining social functioning"; (3) "marked difficulties in maintaining concentration, persistence, or pace"; or (4) "repeated episodes of decompensation, each of extended duration." 20 C.F.R. Pt. 404, Subpt. P, App. 1.

As noted above, Plaintiff argues that she meets the "paragraph B" criteria of both Listings based upon her and her husband's testimony, "as supported by United Summit Center treatment records." The undersigned has already determined that substantial evidence supports the ALJ's determination that Plaintiff (and her husband) were not credible. Furthermore, although Plaintiff argues that such testimony was supported by USC records, she does not provide any detail regarding

which records she believes support the testimonial evidence. Nevertheless, the undersigned notes that at no time did any staff member at USC find that Plaintiff had marked restrictions in either her activities of daily living or concentration, persistence, or pace. In fact, on June 6, 2011, a provider completed a Routine Abstract Form–Mental as to Plaintiff and noted that Plaintiff's pace was moderately deficient. (R. at 389.) Accordingly, because no evidence in the record supports Plaintiff's testimony, the undersigned finds that her argument regarding Listings 12.04 and 12.06 is without merit. See Mitchell v. Colvin, __ F. Supp. 2d __, No. 7:13-CV-42-BO, 2014 WL 991705, at *2 (E.D.N.C. Mar. 12, 2014) (concluding that the ALJ's determination that plaintiff did not meet certain Listings was supported by substantial evidence because plaintiff argued that he met the Listings based only on his testimony and no evidence supported plaintiff's statements).

### E.    Opinion Evidence

Plaintiff also argues that the ALJ's "rejection of the opinions of the medical professionals at United Summit Center ignores the fact that these reports contain objective observations by these professionals." (Plaintiff's Brief at 13.) She further asserts that the ALJ failed to consider all of the GAF scores assigned to her by treating professionals at USC. (Id. at 14.) Defendant asserts that the ALJ complied with the regulations when considering this evidence. (Defendant's Brief at 11-13.)

The undersigned first considers Plaintiff's argument regarding her GAF scores. The fourth edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") states:

> In most situations, the clinical diagnosis of a DSM-IV mental disorder is not sufficient to establish the existence for legal purposes of a "mental disorder," "mental disability," "mental disease," or "mental defect." In determining whether an individual meets a specified legal standard . . ., additional information is usually required beyond that contained in the DSM-IV diagnosis. . . . It is precisely because impairments, abilities, and disabilities vary widely within each diagnostic category that assignment of a particular diagnosis does not imply a specific level of impairment and disability.

American Psychiatric Ass'n, <u>DSM-IV</u>, xxxii-xxxiii (4th ed., text rev. 2000). "A GAF score may reflect the severity of a patient's functioning or her impairment in functioning **at the time** the GAF score is given. Without additional context a GAF score is not meaningful." <u>Green v. Astrue</u>, C/A No. 1:10-1840-SVH, 2011 WL 1770262, at *18 (D.S.C. May 9, 2011) (emphasis added); <u>see also</u> American Psychiatric Ass'n, <u>DSM-IV</u> 33 (indicating that unless otherwise noted, the GAF score generally refers to the level of functioning at the time of evaluation). Nevertheless, GAF scores are considered to be and are evaluated similarly to objective medical evidence. <u>Hoelck v. Astrue</u>, 261 F. App'x 683, 685-86 (5th Cir. 2008) (explaining that the ALJ did consider the lowest GAF score because he mentioned the hospital visit when the low score was assigned, suggesting that the ALJ concluded that the GAF score was to be given little weight); <u>see also</u> <u>Hawks v. Astrue</u>, No. 5:08-00837, 2009 WL 3245267, at *10 (S.D. W. Va. Sept. 30, 2009) (noting that the "ALJ properly noted the inconsistencies between Dr. Ide's assessed marked limitations and the GAF scores of 55, indicating only moderate symptoms or difficulty in functioning").

A GAF score "may have little or no bearing on . . . social and occupational functioning." <u>Kornecky v. Comm'r of Soc. Sec.</u>, 167 F. App'x 496, 511 (6th Cir. 2006); <u>see also</u> <u>Lopez v. Barnhart</u>, 78 F. App'x 675, 678 (10th Cir. 2003); <u>Wilkins v. Barnhart</u>, 69 F. App'x 775, 780 (7th Cir. 2003). Essentially, "a GAF score, without evidence that it impaired [the] ability to work, does not establish an impairment." <u>Camp v. Barnhart</u>, 103 F. App'x 352, 354 (10th Cir. 2004) (alteration in original); <u>see also</u> <u>Ward v. Astrue</u>, No. 3:00-CV-1137-J-HTS, 2008 WL 1994978, at *3 (M.D. Fla. May 8, 2008) ("[A]n opinion concerning GAF, even if required to be accepted as valid, would not translate into a specific finding in regard to functional limitations."). "[T]he Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and

has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" Wind v. Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (quoting Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,746, 50,764-65 (Aug. 21, 2000)).

Plaintiff argues that the ALJ selectively considered her GAF scores by discussing reports from USC indicating GAF scores of 55 but not discussing other reports assigning her GAF scores of 31-40, 45, and 50. (Plaintiff's Brief at 14.) Specifically, on July 30, 2009, NP Linda McPherson assigned a GAF scores of 50. (R. at 284.) On May 7, 2010, Vickie Ashcraft assigned Plaintiff a GAF score of 45. (R. at 304.) On April 24, 2012, Ashley Coontz assigned a GAF score of 31-40 (R. at 488); Sandra Jones assigned the same score on July 5, 2012 (R. at 507). Contrary to Plaintiff's assertion, the ALJ did mention the GAF score of 50 when discussing Ms. Ashcraft's evaluation. (R. at 19.) He did not mention the others when considering those reports. Nevertheless, the undersigned finds that the ALJ's failure to mention these GAF scores was not error, because at no time did any provider who assigned a GAF score suggest that Plaintiff had mental limitations precluding her ability to work. See Camp, 103 F. App'x at 354; Ward, 2008 WL 1994978, at *3.

As noted above, the ALJ also takes issue with the ALJ's rejection of the opinions given by the medical professionals at USC. The only opinion from USC that the ALJ considered is that of Sandra Jones, Plaintiff's therapist at USC. As to Ms. Jones' opinion, the ALJ stated:

> As for the opinion evidence, Sandra Jones, MA, LPC LSW ALPS, the claimant's psychiatric therapist at United Summit Center provided a letter dated June 14, 2012, concerning the claimant's mental impairments. Ms. Jones reported that she had provided the claimant counseling services since July 10, 2009. She reported that the claimant experienced depression and anxiety in addition to mood instability and is unable to be around people because she gets nervous and is easily agitated. Ms. Jones reported that the claimant's attempts to go grocery shopping frequently end up with her getting to the point where she makes verbally aggressive statements to

others and has to be redirected by her husband and will have to leave. Ms. Jones also reported that the claimant can be impulsive at times and her concentration is poor. She also reported that the claimant worries excessively. Ms. Jones stated that the claimant is able to function day to day in taking care of her children with the help of her husband. Ms. Jones reported that the claimant missed appointments because she will not leave her home at times. Ms. Jones concluded that the claimant's symptoms consistently impair her to the degree that she is not able to function in a work setting where she would need to interact with people or be able to concentrate. She stated that the claimant is not able to participate in public activities. Finally, Ms. Jones opined that the claimant's prognosis was poor in any ability for future employment and the length of this incapacity was indefinite. (Exhibit 13F)

This opinion has been considered but given little weight. The residual functional capacity includes limitations concerning interactions with others and a limitation to unskilled work with routine and repetitive tasks. These limitations are consistent with the document [sic] mental symptoms and limitations and jobs were still found.

(R. at 17-18.)

20 C.F.R. §§ 404.1513 and 416.913 establish what sources can provide evidence to establish an impairment. Those sections read:

(a) *Sources who can provide evidence to establish an impairment.* We need evidence from acceptable medical sources to establish whether you have a medically determinable impairment(s). . . . Acceptable medical sources are-
    (1) Licensed physicians (medical or osteopathic doctors);
    (2) Licensed or certified psychologists. . . .;
    (3) Licensed optometrists . . .;
    (4) Licensed podiatrists . . .;
    (5) Qualified speech-language pathologists . . . .

(d) *Other sources.* In addition to evidence from the acceptable medical sources listed in paragraph (a) of this section, we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work. Other sources include, but are not limited to-
    (1) Medical sources not listed in paragraph (a) of this section (for example, nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists);
    (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers);
    (3) Public and private social welfare agency personnel; and
    (4) Other non-medical sources (for example, spouses, parents and other

caregivers, siblings, other relatives, friends, neighbors, and clergy).

20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2) further state:

> Evidence that you submit or that we obtain may contain medical opinions. Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

Nothing in these regulations requires an ALJ to consider the opinion of a therapist. The Fourth Circuit has noted that those other than "an 'acceptable medical source'" do "not qualify" "to make a 'medical assessment' on a Social Security claimant's 'ability to do work-related activities such as sitting, standing, moving about, lifting, carrying, handling objects, hearing, speaking and traveling." Lee v. Sullivan, 945 F.2d 687, 691 (4th Cir. 1991) (citing 20 C.F.R. § 416.913). Assessments completed by those who are not acceptable medical sources "can qualify only as a layman's opinion." Id.

Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939 (Aug. 9, 2006) also provides that a therapist, while a "medical source," is not an "acceptable medical source." Id. at *2. SSR 06-03p states:

> The distinction between "acceptable medical sources" and other health care providers who are not "acceptable medical sources" is necessary for three reasons. First, we need evidence from "acceptable medical sources" to establish the existence of a medically determinable impairment. . . . Second, only "acceptable medical sources" can give us medical opinions. . . . Third, only "acceptable medical sources" can be considered treating sources . . . whose medical opinions may be entitled to controlling weight.

Id. It further notes that:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation

33

functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

Id. at *3. Accordingly, information from "other sources," such as therapists, "may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." Id. at *2.

Here, it is clear from the record that Ms. Jones is Plaintiff's therapist at USC. As such, she cannot be considered as a treating source, and her opinion cannot be entitled to controlling weight. Id. Nevertheless, the ALJ was required to evaluate Ms. Jones' opinion using the factors set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c), which provide:

How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion

(1) Examining relationship. Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(I) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section

in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

> (I) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

> (ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability.* The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) *Consistency.* Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization.* We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) *Other factors.* When we consider how much weight to give a

medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

The Fourth Circuit has also noted that a court "cannot determine if findings are supported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence." Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984). Indeed, "[u]nless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Arnold v. Sec'y of Health, Ed. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977). The Administration has discussed the explanation of the weight to be given to a treating source's medical opinion, as follows:

Paragraph (d)(2) of 20 CFR 404.1527 and 416.927 requires that the adjudicator will always give good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s), i.e., an opinion(s) on the nature and severity of an individual's impairment(s). Therefore:

When the determination or decision:

*is not fully favorable, e.g., is a denial; or

*is fully favorable based in part on a treating source's medical opinion, e.g., when the adjudicator adopts a treating source's opinion about the individual's remaining ability to function;

the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent

reviewers the weight the adjudicator gave to the treating source's medical opinion
and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). "[W]hen a physician offers specific restrictions

or limitations . . . the ALJ must provide reasons for accepting or rejecting such opinions." Trimmer

v. Astrue, No. 3:10CV639, 2011 WL 4589998, at *4 (E.D. Va. Sept. 27, 2011), aff'd by 2011 WL

4574365 (E.D. VA. Sept. 30, 2011). A logical nexus must exist between the weight accorded to

opinion evidence and the record, and the reasons for assigning such weight must be "sufficiently

articulated to permit meaningful judicial review." DeLoatch, 715 F.2d at 150.

> As noted above, the ALJ stated the following in assigning little weight to Ms. Jones' opinion:

> This opinion has been considered but given little weight. The residual functional
> capacity includes limitations concerning interactions with others and a limitation to
> unskilled work with routine and repetitive tasks. These limitations are consistent
> with the document [sic] mental symptoms and limitations and jobs were still found.

(R. at 18.) The undersigned finds that this statement is insufficient to explain the ALJ's decision to

assign "little weight" to Ms. Jones' opinion. Here, the ALJ referred to Ms. Jones' opinion in a

summary fashion without referencing a single opinion or piece of evidence with which it was

inconsistent. Furthermore, at no point did he address any of the other factors set forth above when

considering her opinion.

> Nevertheless, the undersigned finds that the ALJ's error is harmless. Cf. Ngarurih v.

Ashcroft, 371 F.3d 182, 190 n.8 (4th Cir. 2004) ("While the general rule is that an administrative

order cannot be upheld unless the grounds upon which the agency acted in exercising its powers

were those upon which its action can be sustained, reversal is not required where the alleged error

clearly had no bearing on the procedure used or the substance of the decision reached." (internal

quotation marks omitted)). In her opinion, Ms. Jones opined that Plaintiff's "symptoms consistently

impair her to the degree that she is not able to function in a work setting where she would need to interact with people or be able to concentrate." (R. at 493.) The ALJ incorporated these opinions into Plaintiff's RFC, as he found that Plaintiff had the following limitations:

> work must involve only simple routine and repetitive tasks; cannot perform at a production rate pace but can perform goal oriented work; work must entail no more than occasional interaction with supervisors and co-workers, and no interaction with the public; with only occasional changes in the workplace.

(R. at 15-16.)

Given this, the undersigned finds that Ms. Jones' opinions were substantially consistent with the ALJ's determination of Plaintiff's RFC. Accordingly, the ALJ's failure to provide specific reasons for assigning little weight to Ms. Jones' opinion is harmless error. See Morgan v. Barnhart, 142 F. App'x 716, 722-23 (4th Cir. 2005) ("Any error the ALJ may have made in rejecting Dr. Holford's medical opinion, which provided essentially the same time restriction on sitting and standing as the FCE, was therefore harmless."); Rivera v. Colvin, No. 5:11-CV-569-FL, 2013 WL 2433515, at *3 (E.D.N.C. June 4, 2013) ("[A]n ALJ's failure to expressly state the weight given to a medical opinion may be harmless error, when the opinion is not relevant to the disability determination or when it is consistent with the ALJ's RFC determination."); Bautista v. Astrue, Civil No. TJS-11-1651, 2013 WL 664999, at *6 (D. Md. Feb. 22, 2013) ("Assuming, for the sake of argument, that the ALJ erred by failing to assign weight to all of the opinion evidence in the record, the error could not have affected the outcome of the proceedings."). Therefore, the undersigned finds that remand for a determination of those reasons is unnecessary. Cf. Spiva v. Astrue, 628 F.3d 346, 353 (7th Cir. 2010) ("If it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding is a waste of time.").

In her brief, Plaintiff cites to the reports created by Vicky Ashcraft and Ashley Coontz after they conducted assessments of Plaintiff at USC. (Plaintiff's Brief at 13-14.) However, she does not identify these individuals as "treating sources" that should have been given more weight by the ALJ. See Gorayeb v. Astrue, No. 2:11-cv-36, 2011 WL 7431717, at *9 (N.D. W. Va. Oct. 24, 2011) (Seibert, Mag. J.) (rejecting the plaintiff's argument that the ALJ erred by not assigning weight to the opinions of her treating sources because she failed to identify which sources should have been given more weight), aff'd by 845 F. Supp. 2d 753 (N.D. W. Va. 2011). In any event, Ms. Ashcraft's report contains no opinions as to how Plaintiff's impairments affect her functional capacity.

On the other hand, in her report, Ms. Coontz stated that Plaintiff's "symptoms markedly interfere with occupational functioning or with usual social activities or relationships with others." (R. at 491.) Nevertheless, even if the ALJ erred by failing to consider this opinion, the undersigned finds that this error is harmless. Ms. Coontz' opinion substantially mirrored Ms. Jones' opinion regarding Plaintiff's functioning, and the undersigned has already found that the ALJ incorporated Ms. Jones' opinions in his RFC determination. Accordingly, the undersigned finds that the ALJ's RFC determination also accounts for Ms. Coontz' opinion, and no remand for consideration of such opinion is necessary. Spiva, 628 F.3d at 353.

In sum, the ALJ properly followed the regulations governing the treatment of medical opinion evidence. Although the ALJ did not mention some of the lower GAF scores assigned to Plaintiff by providers at USC, none of her providers suggested that Plaintiff had mental limitations precluding her ability to work. See Camp, 103 F. App'x at 354; Ward, 2008 WL 1994978, at *3. Furthermore, although the ALJ did not sufficiently state his reasons for assigning little weight to Ms. Jones' opinion, that error is harmless because the ALJ incorporated Ms. Jones' opinions into his

RFC determination. Accordingly, the undersigned finds that substantial evidence supports the ALJ's treatment of the opinion evidence.

## V. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying Plaintiff's applications for DIB and for SSI. I accordingly recommend Defendant's Motion for Summary Judgment be **GRANTED,** and the Plaintiff's Motion for Summary Judgment be **DENIED**, and this matter be dismissed and stricken from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _16_ day of _June_ , 2014.

John S. Kaull
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE